UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ANA A. DURAN,                         :

                   Plaintiff,         :     14 Civ. 8677 (HBP)

     -against-                        :     OPINION AND
                                            ORDER
CAROLYN W. COLVIN, ACTING,            :
COMMISSIONER, Social
Security Administration,              :

                   Defendant.         :

----------------------------------X


          PITMAN, United States Magistrate Judge:


I.   Introduction


          Plaintiff brings this action pursuant to section 205(g)

of the Social Security Act (the "Act"), 42 U.S.C. § 405(g),

seeking judicial review of a final decision of the Commissioner

of Social Security ("Commissioner") denying her application for

supplemental security income ("SSI") and disability insurance

benefits ("DIB").  The parties have consented to my exercising

plenary jurisdiction in this matter pursuant to 28 U.S.C. §

636(c) (D.I. 7).  Plaintiff and the Commissioner have both moved

for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure (Docket Items ("D.I.") 20, 23).

For the reasons set forth below, the Commissioner's motion for

judgment on the pleadings is denied, plaintiff's motion is granted and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

II.   Facts[1]

    A.   Procedural Background

        Plaintiff filed an application for SSI and DIB on January 24, 2008 alleging disability due to "Lower back pain, Arm pain" (Tr. 305-12, 343).  Plaintiff alleged a disability onset date of March 2007, which she later amended to December 2007 (Tr. 20, 46, 339).  Her application was initially denied on April 30, 2008 (Tr. 146-52).  Plaintiff requested an administrative hearing, which was held on September 23, 2009, before Administrative Law Judge ("ALJ") Robert Gonzalez (Tr. 88-124, 152).  Plaintiff testified through a Spanish interpreter and was represented by a non-attorney representative from the Legal Aid Society of Rockland County (Tr. 90).

---

[1]I recite only those facts relevant to my review.  The administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) (See Notice of Filing of Administrative Record, dated March 7, 2015 (Docket Item 12) ("Tr.")) more fully sets out plaintiff's medical history.

On November 13, 2009, ALJ Gonzalez denied the claim (Tr. 127-40).  The ALJ found that plaintiff could not perform her past relevant light work, but could work at the sedentary exertional level[2] based on limitations on her ability to stand and walk, lift and carry objects greater than 10 pounds and restrictions on her ability to bend, stoop and crawl (Tr. 139). The ALJ denied plaintiff's claim by applying the medical-vocational guidelines, Table 1, Grid Rule 201.23 (Tr. 140).  The Appeals Council granted review and issued an Order of Remand, directing ALJ Gonzalez to request updated records from plaintiff's treating sources, further evaluate her subjective complaints, give further consideration to plaintiff's maximum residual functional capacity and obtain evidence from a vocational expert (Tr. 141-44).

Plaintiff appeared for two additional hearings before ALJ Gonzalez on June 7, 2012 and September 18, 2012, accompanied by her non-attorney representative and a Spanish interpreter (Tr.

---

[2]
Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

58-87, 39-57).  Vocational expert Donald Slive testified at the second of these hearings (Tr. 49-57).  The ALJ issued a second decision adverse to plaintiff on February 11, 2013 (Tr. 20-32).  The ALJ's determination became the Commissioner's final decision on June 11, 2014, when the Appeals Council denied plaintiff's request for review and extended the time to file a civil action (Tr. 1-11).

B.  Social Background

Plaintiff was born in 1966 in the Dominican Republic (Tr. 31, 45).  She went to elementary school in the Dominican Republic but has not taken any classes in the United States (Tr. 45, 80, 100, 350).  Plaintiff's primary language is Spanish, and she speaks and reads "a little" English (Tr. 61, 78-79, 100).[3]  Plaintiff took the U.S. citizenship test twice and passed on her second attempt in 2012 (Tr. 44).

Plaintiff worked for 17 years as a housekeeper at Allendale Nursing Home (Tr. 43, 99, 318, 327, 343-344).  Her duties included cleaning and vacuuming, cleaning toilets, lifting garbage and moving mattresses.  She was on her feet 7-8 hours per

_____

[3]A Social Security Administration ("SSA") employee noted that plaintiff spoke Spanish. (Tr. 341, 342).  Ms. Duran's daughter interpreted for her at her consultative examinations (Tr. 502-03, 507).

4

day (Tr. 43, 94, 99, 344-345).  Plaintiff stopped working in 2007 due to lower back pain that prevented her from doing her job (Tr. 103, 309, 343).  Plaintiff has three children over the age of eighteen (Tr. 101).  Plaintiff is divorced, lives alone on the second floor of a walk-up apartment building and testified that her daughters help her at home (Tr. 73, 101-02).  Plaintiff explained that "Social Services helps [her]" by giving her food stamps, money for rent and paying some bills and that she also receives money from her adult son (Tr. 73).

C.   Medical Background

Plaintiff alleged that she was disabled as of December 2007, and the ALJ determined that her date last insured was December 31, 2012 (Tr. 22, 323, 337).  Therefore, the review of plaintiff's medical history will focus on this time period.

1.   Treatment for
Back, Leg and Knee Pain

a.   Consultative Examination
by Dr. Rose Chan in April 2008

On April 8, 2008, plaintiff underwent a consultative orthopedic examination with Dr. Rose Chan (Tr. 507-09).  Dr. Chan observed that plaintiff "appeared to be in no acute distress,"

had a normal gait and station and could fully squat (Tr. 508).

Plaintiff brought what Dr. Chan described as a "self-prescribed"

and "self-bought" cane to the examination; Dr. Chan opined that

the cane was not medically necessary (Tr. 507-08).  Plaintiff was

able to walk on her toes if she steadied herself with one hand on

the examination table, and she "declined to walk on heels" (Tr.

508).  Plaintiff "[n]eeded no help changing for the exam or

getting on and off [the] exam table," and was "[a]ble to rise

from [a] chair without difficulty" (Tr. 508).  Dr. Chan also

found that plaintiff had full flexion in her cervical spine, full

range of motion in her shoulders, elbows, forearms, wrists and

fingers, somewhat limited flexion in her thoracic and lumbar

spines and full range of motion in her lower extremities (Tr.

508-09).  Dr. Chan found that plaintiff's straight leg raising

test was negative bilaterally (Tr. 508).  Dr. Chan noted that an

x-ray indicated that plaintiff suffered from discogenic disease

at L5-S1[4] (Tr. 509).[5]  She diagnosed plaintiff with chronic low

_____

[4]The lumbar vertebrae, denoted by symbols L1 through L5, are
the five vertebrae below the thoracic vertebrae and above the
sacrum.  Dorland's Illustrated Medical Dictionary, ("Dorland's")
at 1662, 2051 (32nd ed. 2012).  The thoracic vertebrae, denoted
by symbols T1 through T12, are usually twelve in number and are
situated between the cervical and the lumbar vertebrae, giving
attachment to the ribs and forming part of the posterior wall of
the thorax.  Dorland's at 2051.

[5]Dr. Chan does not identify the date of the x-ray to which
(continued...)

back pain that she believed was stable (Tr. 509).  Dr. Chan noted

that plaintiff had a "[m]ild limitation for stooping" and "should

avoid heavy lifting and pushing" (Tr. 509).

> b.  Diagnostic Testing and
>     Treatment by Dr. Deepak
>     <u>Vasishtha and Others from 2007 to 2012</u>

During the relevant time period, plaintiff was primar-

ily treated by pain management specialist Dr. Deepak Vasishtha of

Musculoskeletal Pain Management, P.C. for complaints of back, leg

and knee pain (Tr. 97).  The record contains Dr. Vasishtha's

evaluations and treatment notes as well as diagnostic testing

results ordered by him and others in the 2007 to 2012 time

period.

On August 3, 2007 Dr. Vasishtha completed a form

entitled "Disability Letter," in which he stated that plaintiff

---

[5](...continued)
she is referring.  Her report is part of Exhibit No. 5F in the
Administrative Record, which includes a "Lumbosacral Spine X-Ray"
dated April 9, 2008, the day <u>after</u> Dr. Chan's report.  There are
also two MRI reports in the record that pre-date Dr. Chan's
evaluation -- one from February 2004 and one from January 2008
(Tr. 478-79, 551-52) -- but it is unclear whether Dr. Chan had
access to those documents or any other portion of the medical
record when she prepared her evaluation.  Further, as discussed
below, plaintiff had additional images taken and testing done on
her lumbar spine after April 2008 that would not have been
available to Dr. Chan.

had a diagnosis of lumbar disc herniations,[6] lumbar

radiculopathy[7] and a gait disturbance.  He stated that plaintiff

was totally disabled and unable to work at that time and that her

prognosis was "guarded" (Tr. 669).

On January 17, 2008, Dr. Vasishtha completed another

"Disability Letter" stating that he was treating plaintiff for

"Lumbar Disc Herniation, + B/L Lumbar L4, L5 Radiculopathy + Gait

Disturbance" (Tr. 670).  He stated that plaintiff was totally

disabled, unable to work and that her prognosis was "guarded"

(Tr. 670).

On January 16, 2008, Dr. Vasishtha referred plaintiff

to physical therapy and ordered an MRI of plaintiff's lumbar

spine (Tr. 501).  The results of this MRI, conducted on January

29, 2008, indicated that plaintiff had disc desiccation and disc

bulging at L5-S1, a right intraforaminal[8] disc herniation that

was more pronounced than it was four years earlier and impinge-

ment of the right L5 nerve root (Tr. 551-52).  The report also

---

[6]A herniated disc is the protrusion of the nucleus pulposus
or anulus fibrosus of an intervertebral disc, which may impinge
on spinal nerve roots.  Dorland's at 852.

[7]Radiculopathy is a disease of the nerve roots.  Dorland's
at 1571.

[8]"Foramen", whose plural is "foramina," means "a natural
opening or passage, especially one into or through a bone."
Dorland's at 729.

8

noted that the posterior central disc herniation cited in a
previous study was no longer present (Tr. 552).

Plaintiff's primary care physician Dr. Amir Shahid also
ordered electro-diagnostic testing in June 9, 2008; that testing
showed evidence of chronic S1 radiculopathy (Tr. 671-74).  Dr.
David Colarusso, who performed the electro-diagnostic testing,
recommended additional testing to determine the cause of the
impingement and "conservative therapy to [the] affected region"
(Tr. 672).

Dr. Vasishtha ordered nerve conduction testing in
August 2008 to evaluate plaintiff's continuing complaints of
lower back pain and pain and tingling radiating to her legs (Tr.
539-544).  The testing revealed electro-diagnostic evidence of
left lumbosacral radiculopathy involving the S1 and S2 nerve
roots (Tr. 541).

In January 2009, Dr. Vasishtha completed a form for the
New York State Office of Temporary and Disability Assistance
assessing plaintiff's employability (Tr. 675-76).  He indicated
that plaintiff had low back pain radiating down both legs and
pain in both knees that caused difficulty walking and completing
activities of daily living (Tr. 675).  Dr. Vasishtha indicated
that plaintiff's physical examination showed that she had a
limited range of motion of the lumbosacral spine with tenderness

at L4-S1 and that her straight leg raising test was positive bilaterally (Tr. 675).[9]  As treatment, the doctor recommended physical therapy, NSAIDs (nonsteroidal anti-inflammatory drugs), pain medication and "bracing" (Tr. 675).  Dr. Vasistha prescribed Gabapentin, Tylenol #3 and Medrol dose pak (Tr. 675).  Dr. Vasishtha opined that plaintiff was "very limited" in her ability to lift, carry, push, pull and bend; she was moderately limited in her ability to walk, stand, sit and climb stairs (Tr. 675).  Dr. Vasistha restricted plaintiff from any physical exertion (Tr. 676).

A June 2009 motor nerve study ordered by Dr. Sarwar Sharfuddin showed that plaintiff had chronic left S1 radiculopathy (Tr. 683-86).

In a document entitled "Physician's Report for Claim of Disability Due to Physical Impairment," dated August 25, 2009, Dr. Vasishtha indicated that he had seen plaintiff twice per week for the past year and diagnosed plaintiff with the following "disabling" conditions:  chronic moderate low back pain, moderate pain in both knees and moderate lumbar radiculopathy (Tr. 677).

---

[9]A straight leg-raising test is conducted by having the patient lie in a supine position and lifting the symptomatic leg with the knee fully extended.  Pain in the leg at between 30 and 90 degrees of elevation indicates lumbar radiculopathy, with the distribution of the pain indicating the nerve root is involved. Dorland's at 1900.

He indicated that she was taking narcotic pain medication for these ailments (Tr. 678).  He also noted that plaintiff could sit for a total of five hours, stand and/or walk for a total of two hours, occasionally lift up to 20 pounds, occasionally carry up to 20 pounds, could occasionally bend, squat, crawl and climb and frequently reach (Tr. 678-79).

Dr. Vasishtha continued to treat plaintiff in 2011 and 2012.[10]  Dr. Vasishtha analyzed an x-ray report from January 2011 that indicated muscle spasm of the lumbar spine, loss of disc height at L5-S1, anterior and posterior osteophytes[11] at multiple levels and bony sclerosis[12] at vertebral end plates; a follow-up MRI was recommended (Tr. 725).

In treatment notes from February 2011, Dr. Vasishtha diagnosed plaintiff with multilevel disc herniations and radiculopathy (Tr. 726).  Plaintiff reported that she had at-tended physical therapy but was experiencing increased pain at a

---

[10]The record does not contain treatment notes from Dr. Vasishtha from 2010.  The ALJ noted that Dr. Vasishtha had not provided complete records in response to multiple requests but that what Dr. Vasishtha had provided was sufficient for the ALJ to make his determination (Tr. 25)

[11]An osteophyte is a bony outgrowth associated with the degeneration of cartilage.  Dorland's at 1348.

[12]Sclerosis refers to a hardening, "especially hardening of a part from inflammation, from increased formation of connective tissue and in diseases of the interstitial substance."  Dorland's at 1680.

level of 8 out of 10 in her lower back (Tr. 726).  Dr. Vasishtha
found that plaintiff's range of motion was limited overall in the
lumbar spine; a manual muscle test showed that plaintiff's
strength was a 3+ out of 5 in her back extensor and a 3 out of 5
in her quadriceps (Tr. 726).  Dr. Vasishtha's examination showed
tenderness on palpation[13] at the lower back, crepitus[14] in the
knee joint and medial joint line tenderness (Tr. 729).  Plain-
tiff's straight leg raising test was positive bilaterally and a
patellofemoral[15] compression test was positive (Tr. 729).  Plain-
tiff reported problems with activities of daily living such as
using the toilet, "transferring" and walking long distances (Tr.
729).

At a March 9, 2011 visit with Dr. Vasishtha, plaintiff
complained of moderate-to-severe low back pain radiating down her
right leg and right knee pain with swelling, instability and
frequently experiencing a sensation that her right knee was about
to give way (Tr. 719).  Bending, twisting, pulling and pushing

---

[13]Palpation is the act of feeling with the hand or the
application of the fingers with light pressure to the surface of
the body for the purpose of making a physical diagnosis of the
parts beneath.  Dorland's at 1365.

[14]Crepitus refers to "the crackling sound produced by the
rubbing together of fragments of fractured bone."  Dorland's at
429.

[15]Patellofemoral pertains to the patella and the femur.
Dorland's at 1395.

movements exacerbated her back pain, and she had difficulty climbing stairs and walking on uneven ground due to knee pain (Tr. 719).  Testing revealed that plaintiff's range of motion was limited in the lumbar spine, and a Hoffman test was positive[16] (Tr. 720).  Dr. Vasishtha's examination of the lumbar spine revealed tenderness at the L3-L4, L4-L5 and L5-Sl levels (Tr. 720).  A straight leg raising test was positive on the right side and plaintiff had difficulty with heel and toe walking (Tr. 720). The doctor's examination of plaintiff's right knee revealed pain, swelling, crepitus and limited range of motion (Tr. 720).  Dr. Vasishtha offered the following assessment:

> Status post lumbar disc herniation with disc bulges with lateral recess stenosis[17] resulting:
>
> 1. Lumbosacral radiculopathy acute and chronic at L4-L5 levels.
>
> 2. Osteoarthritis of the right knee.

---

[16]A Hoffman sign is where "a sudden nipping of the nail of the index, middle, or ring finger will produce flexion of the terminal phalanx of the thumb and of the second and third phalanges of some other finger."  See Dorland's at 1712.  A positive Hoffman sign is suggestive of a lesion or impingement along the corticospinal track, which crosses over at the top of the cervical spine and travels down each side of the spinal cord.  See Lisa Emrich, MS Signs vs. Symptoms: What is the Hoffmann Reflex?, Health Guide (January 23, 2011), http://www.healthcentral.com-/multiple-sclerosis/c/19065/129802/reflex/.

[17]Stenosis refers to a narrowing or stricture of a duct or canal.  Dorland's at 1769.

                3. Possible internal derangement secondary to
                   medial meniscal tear of the right knee joint.

(Tr. 720).  Dr. Vasishtha recommended that plaintiff continue

physical therapy and a home exercise program, undergo injection

therapy, use the back and knee braces that she received in 2008

and that she follow up within four to six weeks (Tr. 721).

Plaintiff was prescribed Endocet, a pain medication containing

acetaminophen and oxycodone, Ibuprofen and Savella for joint

pains and body aches (Tr. 721).

        Plaintiff continued to report similar symptoms to Dr.

Vasishtha at an April 4, 2011 visit but noted that her pain had

diminished (Tr. 716-18).  Plaintiff experienced difficulty

walking on uneven ground or going down stairs and felt as if her

knee would give way (Tr. 716).  Plaintiff reported that bending,

pushing, pulling and lifting exacerbated her back pain and that

these movements caused the pain to radiate into her right leg

(Tr. 716).  Dr. Vasishtha observed that plaintiff's range of

motion in the lumbar spine and right knee was limited due to pain

(Tr. 717).  A straight leg raising test was positive on the right

side, and muscle spasm was present from Ll to Sl (Tr. 717).  Dr.

Vasishtha's assessment was lumbar degenerative disc disease with

disc herniation resulting in lumbosacral radiculopathy on the

right L4-L5 and L5-S1 levels and osteoarthritis of the knee joint

14

with a possible meniscal tear (Tr. 717).  Dr. Vasishtha recom-
mended that plaintiff continue physical therapy and medications,
go for further testing and that if plaintiff did not have success
with "conservative management" that she go for nerve root block
injections (Tr. 718).

At a May 5, 2011 follow-up visit with Dr. Vasishtha,
plaintiff reported that the ibuprofen made her dizzy, that her
low back pain had improved, that her knee pain was "acutely
exacerbated" and that she was experiencing a clicking sensation
in her right knee and a feeling that the knee was about to give
way (Tr. 712).  The doctor's testing revealed that plaintiff's
range of motion of the lumbar spine was limited due to pain (Tr.
712).  Testing revealed tenderness at L4-L5 and L5-Sl and plain-
tiff's straight leg raising test was positive (Tr. 714).  Plain-
tiff continued to have difficulty with heel and toe walking (Tr.
714).  Plaintiff's right knee showed swelling and limited range
of motion due to pain (Tr. 714).  Dr. Vasishtha again diagnosed
lumbar degenerative disc disease with disc herniation along with
lumbosacral radiculopathy, as well as osteoarthritis of the right
knee with a possible meniscal tear (Tr. 714).  The doctor recom-
mended that plaintiff continue physical therapy, home exercise,
bracing and pain medication and that she get injections and an
MRI (Tr. 713-14).

15

A May 13, 2011 MRI of plaintiff's right knee showed patellofemoral degenerative changes and chondromalacia patellae;[18] however, no definitive meniscal tear was seen (Tr. 724, 727-28). An MRI of plaintiff's lumbosacral spine completed on the same date showed disc bulging at L5-S1, interior foraminal stenosis on the right side and potential impingement of the exiting right L5 nerve root (Tr. 722-23).

At a June 13, 2011 visit with Dr. Vasishtha, plaintiff complained of moderate-to-severe low back pain radiating down the right lower extremity, which was exacerbated with bending, twisting, pulling and pushing (Tr. 710). Plaintiff also complained of right knee pain and that she could not tolerate the Endocet opioid (Tr. 710). Dr. Vasishta found that plaintiff's range of motion of the lumbar spine and right knee was limited due to pain with all movements, that she ambulated with a stiff and slightly stooped, wide-based gait and that heel and toe walking caused her to have back pain (Tr. 711). A straight leg raising test was positive on plaintiff's right side and muscle spasm was present from Ll to S1 (Tr. 711). Dr. Vasishtha diagnosed plaintiff with chondromalacia patellae of the knee joint

---

[18]Chondromalacia patellae refers to "pain and crepitus over the anterior aspect of the knee, particularly in flexion, with softening of the cartilage on the articular surface of the patella and, in later stages, effusion." Dorland's at 352.

with effusion, lumbar degenerative disc disease with disc herniation with lateral recess stenosis, lumbosacral radiculopathy at L5, right worse than left, and chronic pain syndrome (Tr. 711). The doctor recommended that plaintiff continue with therapy and medications and indicated that he would consider what kind of injections were necessary (Tr. 710-11). To assist in this latter assessment, the doctor sent plaintiff for an electro-diagnostic study of the lower extremity (Tr. 711).

At Dr. Vasishtha's recommendation, plaintiff had two nerve block injections on the right side at L4-L5, one on July 5 and one on July 19, 2011 (Tr. 740, 747-48).

Plaintiff also went to the emergency room at Nyack Hospital on July 15, 2011, complaining of back pain (Tr. 762-69). The doctors in the emergency room noted that plaintiff had a limited range of motion in her back and that a straight leg raising test was positive (Tr. 766-67). She was diagnosed with "lower back pain acute" (Tr. 767).

At an August 16, 2011 visit, plaintiff's primary care doctor Dr. Childebert St. Louis at Hudson River HealthCare listed back pain and depression in plaintiff's medical history (Tr. 850-51). The doctor noted that plaintiff was taking Effexor, an antidepressant, Trazadone for anxiety, Endocet and Naproxen, an anti-inflammatory medication (Tr. 850-51). At this visit,

17

plaintiff exhibited mild decreased range of motion of her spine and point tenderness (Tr. 851).  The doctor's diagnosis included lumbar radiculopathy and major depression not otherwise specified (Tr. 8851).  Tramadol was added for back pain and all other medications were continued (Tr. 851).

Plaintiff went to the emergency room at Nyack Hospital again on April 20, 2012, complaining of severe back pain (Tr. 772).  She had back muscle spasms and was treated with pain medication and muscle relaxers and released that day (Tr. 776-78).

At a May 1, 2012 visit, plaintiff sought follow-up treatment with Dr. St. Louis after her recent emergency room visit due to back pain (Tr. 772-81). Plaintiff was prescribed Flexeril, a muscle relaxant, to treat her lumbar radiculopathy (Tr. 832-34).

At a May 24, 2012 visit to Dr. Vasishtha, plaintiff complained of low back pain with pain radiating down both legs as well as right knee pain with swelling and crackling sensation (Tr. 734).  The doctor stated that plaintiff had shown "good improvement" with physical therapy (Tr. 734).  Dr. Vasishtha's examination of her neurological system revealed hypoesthesia[19] in

_____

[19]Hypoesthesia refers to an abnormally decreased

(continued...)

18

the bilateral L5 area (Tr. 735).  A musculoskeletal examination showed evidence of antalgic[20] posturing in the lumbar spine along with paravertebral muscle guarding, tenderness and spasm from Ll-L5 (Tr. 735).  A straight leg raising test was positive bilaterally (Tr. 735).  Dr. Vasishtha recommended that plaintiff continue physical therapy, pain medication, anti-inflammatory medications and neuromodulator[21] medication (Tr. 736).

Plaintiff complained of back pain again at an August 23, 2012 visit with Dr. St. Louis (Tr. 825).

On December 3, 2012, plaintiff again complained of back pain to Dr. St. Louis (Tr. 814-17).  She had decreased range of motion and tenderness to palpation in her back (Tr. 814-17).  Dr. St. Louis directed plaintiff to follow up with her pain management treatment and referred her to a social worker for evaluation and treatment of her major depression (Tr. 814-17).

---

[19](...continued)
sensitivity, particularly to the touch.  Dorland's at 901.

[20]Antalgic means "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." Dorland's at 97.

[21]"Neuromodulation" includes treatments that involve "stimulation or administration of medications directly to the body's nervous system for therapeutic purposes.  The target cells for stimulation include nerves in the central and peripheral nervous systems, the autonomic nervous system, and the deep cell nuclei of the brain, resulting in modulation of their activity." Neuromodulation, Weill Cornell Medical College, available at http://weillcornellpainmedicine.com/health-library/neuromodulation (last visited Sept. 22, 2016).

19

2.  <u>Psychiatric Treatment</u>

a.  Psychiatric Evaluation by Dr.
    <u>Theodore Williams on April 8, 2008</u>

On April 8, 2008, plaintiff saw Dr. Theodore Williams
for a consultative psychiatric examination (Tr. 502-06).  At the
examination, plaintiff reported that she had ongoing problems
falling asleep but denied ever being depressed, anxious, or
experiencing panic attacks (Tr. 503).  Plaintiff's appearance was
normal, her speech was "[c]lear, concise, well organized, and
rationally based," and her thought processes were coherent (Tr.
503).  Dr. Williams noted that plaintiff "[s]eemed mildly de-
pressed" (Tr. 504), but he ruled out "depressive disorder" and
concluded that "[t]he results of the examination do not appear to
be consistent with any psychiatric or cognitive problems that
would significantly interfere with [plaintiff's] ability to
function on a daily basis" (Tr. 505).  Dr. Williams noted that
plaintiff required asistance in dressing, bathing and grooming
and that her daughter helps her with these activities as well as
cooking, cleaning, laundry and shopping (Tr. 504).  Dr. Williams
recommended that plaintiff continue to obtain treatment for her
physical problems and gave her a prognosis of "fair to good,"
with the "hope[ ] that with continued intervention and support,

she will find symptom relief and maximize her abilities" (Tr. 505).

                             b.   Treatment by Dr. Gerard
                                 <u>Salomon from 2009 to 2011</u>

In March 2009, plaintiff began seeing a psychiatrist, Dr. Gerard Salomon on a monthly basis (Tr. 109-10, 118).

On August 25, 2009, in a form titled "Functional Capacity Questionnaire for Psychiatric Disorders," Dr. Saloman diagnosed plaintiff with anxiety disorder and identified "mild" restrictions in her daily living, social functioning, ability to understand instructions and respond appropriately to co-workers and "moderate" restrictions in her ability to concentrate, ability to satisfy work production and attendance standards, ability to respond to work pressures, ability to perform complex tasks and ability to perform simple tasks on a sustained basis (Tr. 688-91).  Plaintiff's prognosis was fair (Tr. 688).  Dr. Salomon did not check any of the boxes indicating whether plain-tiff has or was expected to experience episodes of deterioration or decompensation (Tr. 691-92).

Dr. Salomon filled out the same form again on May 19, 2011 (Tr. 698-709).  Dr. Salomon again diagnosed plaintiff with anxiety disorder, noted that she had "difficulty breathing

shocking feeling," had an anxious mood and an inability to concentrate and pay attention (Tr. 698-99).  In contrast to his 2009 diagnosis, Dr. Salomon noted that plaintiff now had "moderate" restrictions on her ability to perform the activities of daily living and "marked" limitations on her concentration, persistence or pace and her ability to perform complex tasks on a sustained basis (Tr. 700-02).  Dr. Salomon noted that plaintiff "continually experienced" episodes of deterioration or decompensation and opined that plaintiff was completely unable to function independently outside the home (Tr. 702).  Dr. Salomon opined that plaintiff could not maintain a job due to her inability to concentrate (Tr. 701).[22]

            c.   Treatment by Social
                 Worker Rafaelina Acosta in 2011

        Plaintiff started to see social worker Rafaelina Acosta for psychotherapy treatment in April 2011 (Tr. 703).  In a functional capacity questionnaire dated May 19, 2011, Ms. Acosta diagnosed plaintiff with major depression and noted that she had

---

        [22]The May 2011 form is missing a page, which consists of questions referring to plaintiff's ability understand, remember and carry out instructions, respond appropriately to supervision, respond appropriately to co-workers, satisfy an employer's normal quality standards and ability to respond to customary work pressures (Tr. 692).

delusions or hallucinations (Tr. 703).  Ms. Acosta stated that
plaintiff's response to medications and psychotherapy was poor
and her prognosis was "moderate" (Tr. 704).  Ms. Acosta identi-
fied moderate restrictions on plaintiff's daily living, social
functioning and concentration (Tr. 705-06).  She generally
identified marked restrictions on plaintiff's ability to function
in a work setting, although she identified only moderate limita-
tions on plaintiff's ability to understand, remember and carry
out instructions, as well as on her ability to respond appropri-
ately to supervision (Tr. 707-09).

D.   Proceedings Before the ALJ

1.   Plaintiff's Testimony

Plaintiff appeared and testified at the September 23,
2009, June 7, 2012 and September 18, 2012 hearings with a Spanish
interpreter and a non-attorney representative (Tr. 39-42, 58-60,
88-90).

Plaintiff testified to her physical problems and
limitations, in particular those associated with her chronic
lower back pain and pain and numbness in her legs (Tr. 80-83,
95-99, 105-09, 113).  She described her inability to do household
chores, the difficulties she had dressing and caring for her

personal needs and her limited ability to drive (Tr. 82, 104,
112-14).  Plaintiff told the ALJ that she received a great deal
of assistance with cooking, cleaning and transportation (Tr.
73-74, 82, 99, 104, 111-12).  She also stated that she was unable
to care for her grandchildren because of her inability to lift or
carry them (Tr. 74-75, 102, 114).  She was also unable to take
public transportation (Tr. 83).  She testified about her strug-
gles with depression and anxiety (Tr. 68-69, 109-110, 114,
119-120).  Plaintiff testified that the fact that she could not
work after having her job for 17 years increased her depression
(Tr. 119).  She expressed the desire to return to her work as a
housekeeper, but stated that "I don't think I can" (Tr. 122).

## 2.  <u>Vocational Expert Testimony</u>

Vocational expert Donald Slive testified at the Septem-
ber 18, 2012 hearing.  The ALJ posed the following hypothetical
to Mr. Slive and asked what kind of work such a hypothetical
individual could perform in the national economy:

> I want you to assume a hypothetical person of the
> claimant's age, education and work history.  I want you
> to further assume that the person has a residual func-
> tional capacity for the following work.  The person
> would be limited to a range of light work, and that
> range would be limited by the fact that the person can
> occasionally stoop, and the person can occasionally
> crouch.  Further, this person could understand, remem-
> ber and carry out simple, unskilled work.

24

(Tr. 50).  The expert testified that such a person could not perform plaintiff's past work as a housekeeper but that she could perform the following jobs in the Dictionary of Occupational Titles ("DOT") that he defined as "light": sub-assembler, DOT code 729.684-054, with 14,120 jobs nationally, screwdriver operator, DOT code 699.685-026 with 17,540 jobs nationally and assembler, small products II, DOT code 739.687-030 with 13,450 jobs nationally (Tr. 50-51).  The expert also testified that if the hypothetical individual could not stand for more than two hours in a workday, sit for more than four hours continually and could not lift more than ten pounds, then he or she could not perform these "light" jobs (Tr. 52-53).  The expert also testi-fied that if the hypothetical individual was unable to concen-trate on work for four hours out of an eight hour workday there would be no jobs in the national economy that he or she could perform (Tr. 54-55).

III.  <u>Analysis</u>

    A.  Applicable Legal
        <u>Principles</u>

      1.  <u>Standard of Review</u>

      The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per curiam</u>); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008).  Moreover, the court cannot "affirm an administrative action on grounds different from those considered by the agency." <u>Lesterhuis v. Colvin</u>, 805 F.3d 83, 87 (2d Cir. 2015), <u>quoting</u> <u>Burgess v. Astrue</u>, 537 F.3d 117, 128 (2d Cir. 2008).

      The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.  <u>Byam v. Barnhart</u>, 336 F.3d 172, 179 (2d Cir. 2003), <u>citing</u> <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision," <u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322,

328 (S.D.N.Y. 2009) (Marrero, D.J.).  However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration."  Johnson v. Bowen, supra, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).  Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'"  Selian v. Astrue, supra, 708 F.3d at 417 (citation omitted).

2.  Determination
    of Disability

A claimant is entitled to DIB and SSI if she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."[23] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to work must last twelve months).   In addition, to obtain DIB, the claimant must have become disabled between the alleged onset date and the date on which she was last insured. See 42 U.S.C. §§ 416(i), 423(a); 20 C.F.R. §§ 404.130, 404.315; McKinstry v. Astrue, 511 F. App'x 110, 111 (2d Cir. 2013) (summary order), citing Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).

The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D), and it must be "of such

---

[23] The standards that must be met to receive SSI benefits under Title XVI of the Act are the same as the standards that must be met in order to receive DIB under Title II of the Act. Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  Accordingly, cases addressing the former are equally applicable to cases involving the latter.

28

severity" that the claimant cannot perform her previous work and
"cannot, considering [her] age, education, and work experience,
engage in any other kind of substantial gainful work which exists
in the national economy."  42 U.S.C. §§ 423(d)(2)(A),
1382c(a)(3)(B).  Whether such work is actually available in the
area where the claimant resides is immaterial.  42 U.S.C. §§
423(d)(2)(A), 1382c(a)(3)(B).

In making the disability determination, the Commis-
sioner must consider:  "(1) the objective medical facts; (2)
diagnoses or medical opinions based on such facts; (3) subjective
evidence of pain or disability testified to by the claimant or
others; and (4) the claimant's educational background, age, and
work experience."  Brown v. Apfel, 174 F.3d 59, 62 (2d Cir.
1999), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir.
1983) (internal quotation marks omitted).

In determining whether an individual is disabled, the
Commissioner must follow the five-step process required by the
regulations.  20 C.F.R. §§ 404.1520(a)(4)(i)-(v),
416.920(a)(4)(i)(v); see Selian v. Astrue, supra, 708 F.3d at
417-18; Talavera v. Astrue, supra, 697 F.3d at 151.  The first
step is a determination of whether the claimant is engaged in
substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i),
416.920(a)(4)(i).  If she is not, the second step requires

determining whether the claimant has a "severe medically determi-nable physical or mental impairment."  20 C.F.R.

§§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If she does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  To be found disabled based on a listing, the claimant's medically determina-ble impairment must satisfy all of the criteria of the relevant listing.  20 C.F.R. § 404.1525(c)(3); Sullivan v. Zebley, 493 U.S. 521, 530 (1990); Otts v. Comm'r of Soc. Sec., 249 F. App'x 887, 888 (2d Cir. 2007).[24]  If the claimant meets a listing, the claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

An ALJ's unexplained conclusion at step three of the analysis may be upheld where other portions of the decision and

---

[24]However, "[e]ven if a claimant's impairment does not meet the specific criteria of a Medical Listing, it still may equal the Listing." Valet v. Astrue, 10-CV-3282 (KAM), 2012 WL 194970 at *13 (E.D.N.Y. Jan. 23, 2012).  Specifically, "[t]he Commis-sioner will find that a claimant's impairment is medically equivalent to a Medical Listing if:  (1) the claimant has other findings that are related to his or her impairment that are equal in medical severity; (2) the claimant has a 'closely analogous' impairment that is 'of equal medical significance to those of a listed impairment;' or (3) the claimant has a combination of impairments that are medically equivalent." Valet v. Astrue, supra, 2012 WL 194970 at *13, citing 20 C.F.R. § 404.1526(b)(1)-(3).

other "clearly credible evidence" demonstrate that the conclusion is supported by substantial evidence.  Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982); see also Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112-13 (2d Cir. 2010) (summary order); Otts v. Comm'r of Soc. Sec., supra, 249 F. App'x at 889.  But where the evidence on the issue of whether a claimant meets or equals the listing requirements is equipoise and "credibility determinations and inference drawing is required of the ALJ" to form his conclusion at step three, the ALJ must explain his reasoning.  Berry v. Schweiker, supra, 675 F.2d at 469; see also Norman v. Astrue, 912 F. Supp. 2d 33, 81 (S.D.N.Y. 2012) (Castel, D.J.).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform her past relevant work given her RFC.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-25.  If she cannot, then the fifth step requires assessment of whether, given claimant's RFC, she can make an adjustment to other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If she cannot, she will be found disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945." Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting Social Security Ruling 96-8p, 1996 WL 374184 at *1 (July 2, 1996).  The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work which may be categorized as sedentary, light, medium, heavy or very heavy.[25]  20 C.F.R. §§ 404.1567, 416.967; see Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998).  This ability may then be found to be limited further by nonexertional factors that restrict claimant's ability to work.[26]  See Michaels v. Colvin,

---

[25]Exertional limitations are those which "affect [plaintiff's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. §§  404.1569a(b), 416.969a(b).

[26]Nonexertional limitations are those which "affect only [plaintiff's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping,
(continued...)

621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than her past work.  Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005).

In some cases, the Commissioner can rely exclusively on the medical-vocational guidelines (the "Grids") contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step.  Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995).  "The Grid[s] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid[s] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy."  Gray v. Chater,

---

[26](...continued)
climbing, crawling or crouching.  20 C.F.R. §§ 404.1569a(c), 416.969a(c).

supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388 F.3d at 383.

Exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383. "Significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Bapp v. Bowen, supra, 802 F.2d at 606; accord Selian v. Astrue, supra, 708 F.3d at 421; Zabala v. Astrue, supra, 595 F.3d at 411. When the ALJ finds that the nonexertional limitations significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which the claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks and citation omitted); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

34

### 3. Treating Physician Rule

In considering the evidence in the record, the ALJ must give deference to the opinions of a claimant's treating physicians.  A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).  The Second Circuit has noted that it "'do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion.'"  Morgan v. Colvin, 592 F. App'x 49, 50 (2d Cir. 2015) (summary order), quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); accord Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015).  Before an ALJ

35

can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the opinion should be given.  These factors include:  (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); Schisler v. Sullivan, supra, 3 F.3d at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.); Matovic v. Chater, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12, 1996) (McKenna, D.J.).  Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor.  Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").

     As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwar-

36

ranted.  See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see also Atwater v. Astrue, supra, 512 F. App'x at 70; Petrie v. Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order).  The ALJ is responsible for determining whether a claimant is "disabled" under the Act and need not credit a physician's determination to this effect where it is contradicted by the medical record.  See Wells v. Comm'r of Soc. Sec., 338 F. App'x 64, 66 (2d Cir. 2009) (summary order).  The ALJ may rely on a consultative opinion where it is supported by substantial evidence in the record.  See Richardson v. Perales, supra, 402 U.S. at 410; Camille v. Colvin, -- F. App'x --, No. 15-2087, 2016 WL 3391243 at *1 (2d Cir. June 15, 2016) (summary order); Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995); Mongeur v. Heckler, supra, 722 F.2d at 1039.

4.  Credibility

In determining a claimant's RFC, the ALJ is required to consider the claimant's reports of pain and other limitations, 20 C.F.R. § 416.929, but is not required to accept the claimant's subjective complaints without question.  McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980). "It is the function of the [Commissioner], not [the reviewing

courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983); see also Mimms v. Heckler, 750 F.2d 180, 185-86 (2d Cir. 1984); Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591-92 (2d Cir. 1984). The ALJ has discretion to weigh the credibility of the claimant's testimony in light of the medical findings and other evidence in the record. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

The regulations provide a two-step process for evaluating a claimant's subjective complaints.

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability. 20 C.F.R. § 404.1529(a). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. Id. The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." 20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

Genier v. Astrue, supra, 606 F.3d at 49 (alterations and emphasis
in original); see also 42 U.S.C. § 423(d)(5)(A); Snyder v.
Colvin, 15-3502, 2016 WL 3570107 at *2 (2d Cir. June 30, 2016)
(summary order), citing SSR 16-3P, 2016 WL 1119029 (Mar. 16,
2016);[27] 20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The
ALJ must explain his decision to reject a claimant's testimony
"'with sufficient specificity to enable the [reviewing] Court to
decide whether there are legitimate reasons for the ALJ's disbe-
lief' and whether his decision is supported by substantial
evidence."  Calzada v. Astrue, 753 F. Supp. 2d 250, 280 (S.D.N.Y.
2010) (Sullivan, D.J.) (alteration in original), quoting Fox v.
Astrue, 05 Civ. 1599 (NAM)(DRH), 2008 WL 828078 at *12 (N.D.N.Y.
Mar. 26, 2008); see also Lugo v. Apfel, 20 F. Supp. 2d 662, 664
(S.D.N.Y. 1998) (Rakoff, D.J.).  The ALJ's determination of
credibility is entitled to deference.  See Snell v. Apfel, 177
F.3d 128, 135-36 (2d Cir. 1999) ("After all, the ALJ is in a
better position to decide issues of credibility"); Gernavage v.
Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) (Leisure,
D.J.) ("Deference should be accorded the ALJ's determination

---

[27]SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2,
1996), and clarifies the policies set forth in the previous SSR.
See SSR 16-3P, supra, 2016 WL 1237954.

because he heard Plaintiff's testimony and observed his de-
meanor.").

    B.    The ALJ's
          <u>Decision</u>

      The ALJ applied the five-step analysis described above
and determined that plaintiff was not disabled (Tr. 22-32).

      At step one, the ALJ found that plaintiff had not
engaged in substantial gainful activity since her alleged onset
date in December 2007 (Tr. 22).

      At step two, the ALJ found that plaintiff suffered from
the following severe impairments: anxiety disorder, degenerative
disc disease of the lumbar spine and internal derangement and
chondromalacia patella of the right knee (Tr. 22).

      At step three, the ALJ concluded that plaintiff's
alleged impairments, either singly or in combination, were not
medically equal to the impairments listed in 20 C.F.R. Pt. 404,
Subpt. P, App. 1 (Tr. 23-24).  Specifically, he found that
plaintiff did not meet the listings for musculoskeletal disorders
in Listings 1.02 or 1.04 or for mental disorders in Listing 12.06
(Tr. 23-24).

The ALJ then determined that plaintiff retained the
RFC to perform "a wide range of exertionally light work"[28] that
does not require more than "occasional crouching or stooping" and
that she could "remember and carry out simple, unskilled work
tasks" (Tr. 24).  In determining plaintiff's RFC, the ALJ consid-
ered plaintiff's application, testimony, medical records and
reports and her consultative examinations (Tr. 24-30).  The ALJ
concluded that plaintiff received "conservative treatment" at
Musculoskeletal Pain Management, P.C. "for several years in
connection with complaints of lower back pain and right knee
pain" consisting of physical therapy, prescription medications
and a series of epidural steroid injections (Tr. 25).  The ALJ
concluded that the severity of plaintiff's conditions diminished
with this treatment (Tr. 26) and concluded that this "conserva-

---

[28]
> Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects
> weighing up to 10 pounds.  Even though the weight
> lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or
> when it involves sitting most of the time with some
> pushing and pulling of arm or leg controls.  To be
> considered capable of performing a full or wide range
> of light work, you must have the ability to do substan-
> tially all of these activities.  If someone can do
> light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting
> factors such as loss of fine dexterity or inability to
> sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

tive treatment history" was consistent with the "rather benign findings" of consultative orthopedic examiner Dr. Chan from 2008 (Tr. 26), which predated much of Dr. Vasishtha's treatment of plaintiff.

The ALJ also found that plaintiff received "conservative psychiatric treatment from Dr. Gerard [Salomon] of North Rockland Bahavioral Center since at least April 2009 due primarily to complaints of anxiety with driving" (Tr. 26). The ALJ noted that Dr. Salomon diagnosed plaintiff with anxiety disorder and that she remained in stable condition with prescribed treatment (Tr. 26). The ALJ recognized that the social worker Rafaelina Acosta found that plaintiff had more marked impairments in her mental state, but noted that Ms. Acosta was not an acceptable medical source (Tr. 22, 26-27).

In concluding that plaintiff had the RFC to do light work, the ALJ gave great and significant weight, respectively, to the 2008 opinions of the consultative examiners Dr. Chan and Dr. Williams (Tr. 29). The ALJ concluded that the opinions from plaintiff's treating sources were not entitled to controlling weight because they were inconsistent with their own objective findings and with those of the consultative examiners (Tr. 29-30). He gave Dr. Vasishtha's opinion "little weight" (Tr. 29). The ALJ also found plaintiff's testimony to be "shifty and

contradictory," and, therefore, not entirely credible (Tr. 28-
29).  Based on the record, the ALJ concluded that the "objective
medical evidence of record . . . documents a well-managed psychi-
atric disorder and a musculoskeletal disorder that has responded
well to treatment and has not caused any significant neurological
abnormality" (Tr. 30).

At step four, the ALJ concluded that plaintiff was
unable to perform the duties of her past work as a housekeeper
(Tr. 30-31).

At step five, relying on the testimony of the voca-
tional expert, the ALJ found that jobs existed in significant
numbers in the national economy that plaintiff could perform,
given her RFC, age and education (Tr. 31-32).  He found that
plaintiff was a "younger individual age 18-49, [as of] the
alleged disability onset date" and was illiterate in English (Tr.
31).  The ALJ noted that the vocational expert testified that
given plaintiff's age, education, work experience and RFC,
plaintiff could perform the "requirements of representative
occupations such as the position of sub-assembler, with 14,120
jobs nationally; power screwdriver operator with 17,520 jobs
nationally; or as assembler of small products III, with 13,450
jobs nationally" (Tr. 31).  Based on these vocational factors,

plaintiff's RFC and the vocational expert's testimony, the ALJ concluded that plaintiff was not disabled (Tr. 30-32).[29]

C.  Analysis of the
    ALJ's Decision

        Plaintiff primarily argues that the ALJ's decision should be overturned on three grounds:  (1) the ALJ's assessment that plaintiff did not meet the requirements of Listing 1.04A was erroneous and not supported by substantial evidence, (2) the ALJ's RFC assessment was erroneous because it was based on a misapplication of the treating physician rule and (3) the ALJ erred in his evaluation of plaintiff's credibility (see Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Pleadings, dated Jan. 25, 2016, (D.I. 21) ("Pl. Mem.")).  The Commissioner contends that the ALJ's decision was supported by substantial evidence and should be affirmed (Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings, dated Feb. 16, 2016, (D.I. 24) ("Comm'r Mem.").

---

        [29]Plaintiff asserts that the ALJ relied on Grid Rule 202.18 to find that plaintiff was not disabled (Pl. Mem. at 22-23 & 3 n.5, citing Tr. 24).  However, this argument is misplaced; the ALJ did not base his findings on the Grids because he acknowledged that plaintiff had "additional limitations" that precluded their application (Tr. 31).

1.  <u>Listing 1.04A</u>

Plaintiff first argues that the ALJ erred when he concluded that plaintiff did not meet a listing.  Plaintiff claims that the medical evidence shows that plaintiff's back impairments meet, or at least equal, the requirements of Listing 1.04A (Pl. Mem. at 15-18; Plaintiff's Brief in Reply to Defendant's Memorandum of Law, dated Feb. 24, 2016, (D.I. 25) ("Pl. Reply") at 1-2).  The Commissioner responded to plaintiff's argument in a footnote, stating that the ALJ's decision was "based on his analysis of the substantial evidence in the record" (Comm'r Mem. at 12 n.4).  The Commissioner's brief cites only to the ALJ's decision and does not identify the "substantial evidence in the record" to which the Commissioner refers.

Listing 1.04A, entitled "Disorders of the spine," provides:

> <u>Disorders</u> <u>of</u> <u>the</u> <u>spine</u> (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, posi-

> tive straight-leg raising test (sitting and su-
> pine). . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.  Of the require-
ments in Listing 1.04A, the ALJ only took issue with plaintiff's
claim that she suffered from motor loss (Tr. 23).[30]  "Muscular
atrophy" refers to "a wasting of muscle tissue; there are many
kinds and causes."  Dorland's at 176.  Further, an "[i]nability
to walk on the heels or toes, to squat, or to arise from a
squatting position, when appropriate, may be considered evidence
of significant motor loss."  20 C.F.R. Pt. 404, Subpt. P, App. 1,
§ 1.00E(1).

The ALJ's decision contains no substantial explanation
for his conclusion that plaintiff did not meet the "motor loss"

---

[30]The Commissioner does not address whether there is evi-
dence that plaintiff met the other requirements of Listing 1.04A,
but there is evidence indicating that plaintiff did meet these
requirements.  There is evidence in the record that she was
diagnosed with (a) spinal stenosis and degenerative disc disease
resulting in compromise of the nerve root through diagnostic test
results (Tr. 23, 541, 551-52, 672-84, 722-25), (b) nerve root
compression characterized by neuro-anatomic distribution of pain
as evidenced by plaintiff's experience of pain and numbness and
diagnostic test results (Tr. 539-544, 671-72, 675-676, 719, 726,
729) and (c) limitation in the motion of the spine as evidenced
by physical examinations (Tr. 675-76, 710-21, 725-26, 729, 735,
766, 814-17, 827).  Further, plaintiff's straight leg raising
tests were positive during the relevant time period including on
March 9, 2011 (Tr. 719), April 4, 2011 (Tr. 717), May 5, 2011
(Tr. 714), June 13, 2011 (Tr. 711) and May 24, 2012 (Tr. 735).
Plaintiff also had positive sitting straight leg tests on March
9, 2011 (Tr. 720), April 4, 2011 (Tr. 717), May 5, 2011 (Tr.
714), May 24, 2012 (Tr. 735) and June 13, 2012 (Tr. 711).

aspect Listing 1.04A, and the explanation he does provide is based on a selective view of the record (see Tr. 20).  The ALJ's only direct statement with regard to plaintiff's argument that she met Listing 1.04A was that "[w]ith regard to part A of the listing, while the MRIs have shown evidence suggestive of nerve root impingement at L5, physical examinations have consistently failed to yield evidence of muscle atrophy, as required to establish the requisite finding of motor loss" (Tr. 23).  In other areas of his decision, the ALJ stated that although plain-tiff "had difficulty with toe- and heel-walking, she maintains an intact tandem gait and full muscle strength throughout the upper and lower extremities, with the exception of mildly diminished muscle strength in the right ankle and extensor hallucis longus"[31] (Tr. 25).  The ALJ later noted that "while [Dr. Visashtha] has found her to have positive straight leg raising, there is no evidence of muscle atrophy or of diminished sensa-tion, and both muscle strength and deep tendon reflexes have remained largely intact" (Tr. 28).  The ALJ's discussion, how-ever, was flawed with respect to the significance of the evidence of muscle atrophy to Listing 1.04A and in the ALJ's analysis of plaintiff's muscle weakness and gait.

---

[31]Hallucis is the plural of hallux, which refers to the big toe.  Dorland's at 818.

47

First, by focusing on muscle atrophy as a prerequisite to a showing of motor loss, the ALJ failed to fully consider the other bases for motor loss, including plaintiff's difficulty with walking.  Listing 1.04A indicates that motor loss can be either "atrophy with associated muscle weakness or muscle weakness."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A (emphasis added).  As noted above, the listings specifically state that an inability to walk on one's heels or toes can be considered evidence of "significant motor loss."  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(E)(1); accord Norman v. Astrue, supra, 912 F. Supp. 2d at 81 ("With respect to muscle weakness, however, while the medical evidence is not overwhelming -- it does indicate that plaintiff may have had some difficulty with walking on his heels or toes and/or squatting."); Olechna v. Astrue, No. 08-CV-398, 2010 WL 786256 at *6 (N.D.N.Y. Mar. 3, 2010) (noting that "[p]laintiff's muscle weakness was also documented in his inability or difficulty with heal and toe walking").  Plaintiff's difficulty with walking on her heels and toes was consistently noted by the treating sources as well as Dr. Chan, the consultative examiner whose opinion was given "great weight" by the ALJ (Tr. 29).  Dr. Chan observed in 2008 that plaintiff could only walk on her toes if she was holding on to a table and would not attempt walking on her heels (Tr. 508 ("With one hand on the table, she was able to

48

walk on toes.  She declined to walk on heels.")).  Thereafter, in
treatment notes from 2011, plaintiff's treating physician Dr.
Vasishtha consistently observed that plaintiff had difficulty or
could not walk on her heels and toes (Tr. 711, 714, 720, 738).
Although Dr. Chan concluded that there was no muscle weakness in
plaintiff's upper or lower extremities, this conclusion does not
account for plaintiff's continued inability to walk on her heels
or toes in 2011 and later.

Second, although the ALJ concluded that plaintiff
maintained an "intact tandem gait" and full or mildly limited
muscle strength in the upper and lower extremities (Tr. 25),
apparently referencing a June 2011 treatment note (Tr. 711),
other treatment notes evidence that plaintiff did not maintain a
fully normal gait and muscle strength.  In June 2011, plaintiff
was observed to be walking with a "stiff and slightly stooped
gait, slightly wide-based" (Tr. 711) and in May 2012, plaintiff's
examination showed evidence of antalgic posturing (a posture
assumed to lessen pain) in the lumbar spine along with
paravertebral muscle guarding (a protective response) (Tr. 735).
Moreover, in 2011, plaintiff's treating physician reported that
plaintiff had difficulty walking long distances and engaging in
other activities of daily living (Tr. 729 (in February 24, 2011,
noting that plaintiff reported that she was having problems in

49

activities of daily living like "toileting, transferring, walking
long distances")).  Finally, although plaintiff's manual muscle
strength tests often showed only mild limitations in her knee and
ankles, a May 2011 MRI showed evidence of degeneration in her
knee and a possible meniscal tear, which corroborates plaintiff's
consistent testimony that she had difficulty walking on stairs
and had pain with bending (Tr. 714, 717, 720, 724, 727-28).
Thus, the ALJ's conclusions regarding plaintiff's muscle strength
and gait are belied by contrary evidence in the record, which the
ALJ did not address.

Finally, although the ALJ focused on the limited
evidence of reflex loss, there is evidence that plaintiff's motor
loss was accompanied by sensory loss, which is sufficient as an
alternative to a showing of reflex loss.  There is evidence in
the record that plaintiff experienced muscle spasms, numbness,
tingling and pain radiating into her legs (Tr. 671-74, 683-86,
710, 716-19, 722-25, 734-35, 776; see also Tr. 25 (ALJ noting
that "[a]ccording to the available treatment records, the claim-
ant has typically presented to follow-up appointments with
complaints of moderate to severe lower back pain that radiates to
her lower extremities, as well as moderate right knee pain
associated with a sensation of giving way.")).  Thus, there is

also evidence in the record that plaintiff's motor loss was accompanied by sensory loss.

Although the evidence of plaintiff's motor loss may not be overwhelming, it is non-trivial evidence that plaintiff met the elements of Listing 1.04A.  Because the ALJ failed to fully address the medical evidence that potentially meets the listing requirements, I cannot conclude that there is "sufficient uncon- tradicted evidence in the record to provide substantial evidence for the conclusion that [p]laintiff failed to meet step three." See Sava v. Astrue, 06 Civ. 3386 (KMK)(GAY), 2010 WL 3219311 at *4 (S.D.N.Y. Aug. 10, 2010) (Karas, D.J.); see also Berry v. Schweiker, supra, 675 F.2d at 469; Norman v. Astrue, supra, 912 F. Supp. 2d at 81; Rivera v. Astrue, No. 10 CV 4324 (RJD), 2012 WL 3614323 at *11-*12 (E.D.N.Y. Aug. 21, 2012).  On remand, the ALJ should consider whether plaintiff meets the requirements of Listing 1.04A and, if the ALJ adheres to his prior decision, he should explain his reasoning for his ultimate determination with sufficient specificity to allow a reviewing court to evaluate that determination.

> 2.   Plaintiff's Remaining
>      <u>Arguments In Favor of Remand</u>

Although I conclude that the matter should be remanded
for further proceedings, in an effort to minimize the chance of a
subsequent appeal, I make note of the following legal principles
to assist the ALJ in those proceedings.

>      a.   <u>Treating Physician Rule</u>

Plaintiff also argues that the ALJ erred by affording
more weight to one-time consultative examiners because their
opinions were inconsistent with the medical record and that the
opinions of plaintiff's treating physicians should have been
accorded controlling weight (Pl. Mem. at 19-22).  The Commis-
sioner contends that the ALJ gave valid reasons for assigning
plaintiff's treating physicians' opinions limited weight and that
the opinions of the consulting examiners were supported by
substantial evidence (Comm'r Mem. at 15-18).

With respect to plaintiff's orthopedic limitations, the
ALJ gave "great weight" to the opinion of one-time examining
consultant Dr. Chan, stating that

> [t]his opinion generally describes an ability to per-
> form exertionally light work and is offered by an
> examining specialist in a relevant field of medicine.
> Additionally, Dr. Chan's opinion is consistent with the
> rather minimal objective findings yielded by her com-

prehensive examination of the claimant, and with the
findings of Dr. Vasistha, who typically found no sig-
nificant neurological abnormalities.

(Tr. 29).  The ALJ found that Dr. Vasishtha's disability assess-

ments were not entitled to controlling weight because his opin-

ions regarding plaintiff's limitations were "inconsistent both

with [his] own objective findings and with those of the consulta-

tive examine[r]" (Tr. 29).  The ALJ also found that Dr.

Vasishtha's opinion was entitled to little weight because he

"[f]ailed to cite any specific objective clinical factors as the

basis for his conclusions and instead, has offered only the

claimant's subjective complaints" and because Dr. Vasishtha only

prescribed "conservative" treatment for plaintiff (Tr. 29-30).

     The ALJ's decision is problematic for several reasons.

First, the ALJ's conclusion that Dr. Vasishtha's assessments from

January 2009 and August 2009 should be discounted because they

are inconsistent with the objective findings of Dr. Chan from

April 2008 makes little sense because Dr. Vasishtha's opinions

are based on clinical findings that significantly post-date Dr.

Chan's examination.  The record contains at least five diagnostic

studies between June 2008 and May 2011 that Dr. Chan's assessment

could not have taken into account (Tr. 539-44, 683-86, 725, 722-

74, 727-28).  Opinions from a one-time consultative physician are

not ordinarily entitled to significant weight, in particular

where that physician does not have the benefit of the complete
medical record.  See Selian v. Astrue, 708 F.3d 409, 419 (2d Cir.
2013) ("We have previously cautioned that ALJs should not rely
heavily on the findings of consultative physicians after a single
examination.") (citation omitted); Tarsia v. Astrue, 418 F. App'x
16, 18 (2d Cir. 2011) (summary order) ("Because it is unclear
whether [the consulting physician] reviewed all of [plaintiff's]
relevant medical information, his opinion is not 'supported by
evidence of record' as required to override the opinion of [the]
treating physician"); Gunter v. Commissioner of Social Security,
361 F. App'x 197, 200 (2d Cir. 2010) (summary order) (holding
that Commissioner's evidence was not sufficiently substantial to
override the treating physician's assessment of the plaintiff's
abilities, where consulting doctor did not review plaintiff's
complete medical record); Latterell v. Commr. of Social Sec.,
5:14-CV-00008, 2015 WL 1102399 at *6 (D. Vt. Mar. 11, 2015) (it
is "ordinarily . . . reversible error for the ALJ to accord
substantial weight to the opinion of a consultative examiner who
did not review an opinion from the treating physician."); Jackson
v. Colvin, 13 Civ. 5655 (AJN)(SN), 2014 WL 4695080 at *20
(S.D.N.Y. Sept. 3, 2014) (Nathan, D.J.) (ALJ erred in giving one-
time examining consultative physician's opinion "great weight"
where he was not provided with plaintiff's medical records).

54

Second, the ALJ's conclusory statement that Dr. Vasishtha's conclusions were not supported because the record did not show objective neurological abnormalities is not accurate. In June 2008, electro-diagnostic testing showed evidence of chronic S1 radiculopathy (Tr. 671-74). A nerve conduction test in August 2008 showed that plaintiff had left lumbosacral radiculopathy, involving the S1 and S2 nerve roots (Tr. 539-544). A motor nerve study in June 2009 also showed that plaintiff had chronic left S1 radiculopathy (Tr. 683-86). Further, the MRI of plaintiff's lumbar spine in 2011 "was positive for bulging with lateral predominance at L5-S1 with concomitant component of right intraforaminal disc herniation with bilateral inferior neural foraminal stenosis, right greater than the left impinging upon the inferior aspect of the exiting right LS nerve root" (Tr. 710). As the ALJ recognized, the diagnostic findings post-dating Dr. Chan's examination confirm "the existence of a herniated disc at L5-S1 causing moderate spinal canal stenosis and likely nerve root impingement . . . ." (Tr. 23). Further, other objective tests that measure possible nerve damage, including straight leg tests were consistently positive in 2011 (Tr. 711, 714, 717, 719, 735). The test results and doctor's treatment notes note chronic back pain, muscle spasms and pain, numbness and/or tingling in plaintiff's legs (Tr. 539-544, 671-74, 683-86, 710, 726, 734,

716-19, 735, 776).  Indeed, in Dr. Vasishtha's August 25, 2009 disability assessment he cited to "lumbar pain moderate chronic 1 yr," "[chronic] Bilateral knee pain moderate," and "[chronic] lumbar radiculopathy moderate 1 yr" as a basis for his conclusion that plaintiff was disabled (Tr. 677).  Therefore, the ALJ's conclusion that Dr. Vasishtha's opinion was not entitled to controlling weight because it was based solely on plaintiff's subjective complaints is factually incorrect.

Third, although the ALJ concluded that plaintiff experienced improvement with "conservative treatment" of physical therapy, injections and medication (Tr. 25-26), the record demonstrates that the ALJ's conclusion is based on a selective view of the record.  Dr. Vasishtha's treatment notes demonstrate that while plaintiff's pain sometimes improved, sometimes her pain was worse and she consistently reported pain despite treatment.  For example, in June 2008, plaintiff presented with a worsening of her chronic lower back pain radiating to her lower extremities, accompanied by numbness, tingling and weakness of her bilateral lower extremities (Tr. 671).  Later, in June 2011, Dr. Vasishtha noted that plaintiff presented with "moderate-to-severe pain," limited range of motion in her lumbar spine associated with pain in all rotations and that she walked with a stiff and slightly stooped gait, slightly wide-based (Tr. 710-11).

Further, although the ALJ stated that plaintiff's conservative treatment involved only epidural steroid injections (Tr. 25), the record demonstrates that Dr. Vasishtha ultimately recommended, and plaintiff had, two nerve block injections (Tr. 740, 747-748).  Further, despite undergoing two nerve block injections in July 2011, plaintiff went to the emergency room in July 2011 and April 2012 complaining of back pain (Tr. 762-69, 772-81).  At the first visit, the doctors noted plaintiff's limited range of motion of the lumbar spine and a positive straight leg raising test (Tr. 766-767).  At the second visit, less than a year later, the doctors noted that plaintiff had back muscle spasms and was treated with pain medication and muscle relaxers (Tr. 772-781). The ALJ's conclusion that plaintiff received only conservative treatment thus fails to take into account the medical record from Dr. Vasishtha and others showing that over the course of several years plaintiff continuously tested positive for and reported pain and other symptoms associated with degenerative disc disease.

The ALJ's decision to discount Dr. Vasishtha's opinion was directly relevant to the ALJ's RFC determination.  Dr. Vasishtha opined that plaintiff was limited to sitting for five hours, standing/walking for two hours out of an eight hour workday and lifting/carrying up to twenty pounds occasionally

(Tr. 678-79).   The vocational expert testified that if the ALJ's hypothetical was changed such that the claimant could not stand for more than two hours in a workday, sit for more than four hours continually and lift more than ten pounds, then she could not perform the "light" jobs identified (Tr. 52-53).   Dr. Vasishtha's assessment is inconsistent with a full range of light work, which requires an individual to be able to stand and walk for approximately 6 hours in an 8-hour workday.   SSR 96-9p, 1996 WL 374185 at *6 (July 2, 1996).   Thus, the ALJ's RFC determination, which discounted plaintiff's treating physician opinion was not supported by substantial evidence.[32]

---

[32]Plaintiff also argues that the ALJ's 2013 RFC finding that plaintiff could engage in "light" activity was inconsistent with his 2009 decision that she could only engage in "sedentary" activity and thus violated administrative <u>res judicata</u> principles set forth in SSA Acquiescence Ruling 98-4(6) (Pl. Mem. at 20, <u>citing</u> <u>Drummond v. Commissioner of Social Security; Effect of</u> <u>Prior Findings on Adjudication of a Subsequent Disability Claim</u> <u>Arising Under the Same Title of the Social Security Act</u>, 63 F.R. 29771-01, 1998 WL 274052 (June 1, 1998) ("AR 98-4(6)")).   Further, plaintiff argues that if plaintiff could only engage in sedentary activity, the Grids mandate a finding that she is not disabled (Pl. Mem. at 22-23 & n.5).   As an initial matter, AR 98-4(6) applies only to claimants who reside in Kentucky, Michigan, Ohio or Tennessee.   <u>See</u> AR 98-4(6) at *29773.   As noted in that decision, SSA policy outside those areas is that unless the "same [time period,] parties, facts and issues are involved in both the prior and subsequent claims," then "SSA considers the issue of disability with respect to the unadjudicated period to be a new issue that prevents the application of administrative res judicata."   AR 98-4(6) at *29773.   Here, the initial decision was based on the medical record through November 3, 2009 and the
(continued...)

Plaintiff also argues that the ALJ erred by giving
"significant weight" to the opinion of consulting psychological
examiner Dr. Williams.  Dr. Williams opined that plaintiff had no
"significant objective limitations, but may have difficulty
maintaining a regular schedule and performing complex tasks" (Tr.
29).  In contrast, plaintiff's treating psychologist Dr. Salomon
checked boxes in a psychiatric assessment form indicating that,
among other things, plaintiff had "marked limitations in atten-
tion and concentration, and the ability to satisfy normal produc-
tion and attendance standards" (Pl. Mem. at 23, citing Tr. 699,
701, 702, 707-09).  The ALJ found that Dr. Williams' assessment
to be more consistent with Dr. Salomon's treatment notes (Tr.
29).  Plaintiff does not cite to any portion of Dr. Salomon's
treatment notes to contradict this statement nor does a review of
those handwritten notes -- to the extent they are legible --
contradict the ALJ's finding (Tr. 796-809).  Thus, while plain-

---

[32](...continued)
decision under review was based on an updated medical record
through 2012.  Plaintiff's argument, based solely on a citation
to AR 98-4(6), does not address the relevance of the new evi-
dence, the SSA's policy as applied in this jurisdiction or any
other relevant legal principles as applied in this Circuit.  Nor
has the Commissioner responded to plaintiff's argument on this
issue.  It is not necessary to address this issue, however,
because there are other bases for remand.  Plaintiff may wish to
present a more fulsome argument on this point to SSA in subse-
quent administrative proceedings.

tiff may raise this issue again on remand to the Commissioner, plaintiff has not demonstrated that the ALJ erred in his evaluation of plaintiff's asserted psychological disability.

Accordingly, the reasons cited by the ALJ for rejecting Dr. Vasishtha's opinion were flawed and on remand the ALJ should assess Dr. Vasishtha's opinion according to the factors set forth in 20 C.F.R. § 404.1527(c).

### b.  Plaintiff's Credibility

Plaintiff next argues the ALJ erred in assessing plaintiff's credibility regarding the intensity, persistence and limiting effects of her pain because the ALJ failed to ask plaintiff about contradictions in the record regarding her use of assistive devices that he relied on to discredit her testimony (Pl. Mem. at 25-26).  The Commissioner responds that the ALJ properly weighed the medical evidence in assessing plaintiff's credibility (Comm'r Mem. at 14-15).

The ALJ erred in his credibility finding at the first step of the analysis for the same reasons discussed above with respect to the ALJ's application of the treating physician rule. At the first step, notwithstanding the objective medical evidence of record that established diagnoses of degenerative disc disease

and impairments of the right knee, the ALJ found that the "objective medical evidence of record simply does not corroborate" plaintiff's "frequent assertions that she is in so much pain that she cannot dress or bathe herself without assistance, nor can she perform household activities such as cooking, cleaning or shopping" (Tr. 28).  As discussed above, the ALJ improperly weighed the opinion of plaintiff's treating physician Dr. Vasishtha regarding the severity of plaintiff's impairments and impact on her ability to carry out daily activities and instead gave "great weight" to the opinion of Dr. Chan, who examined plaintiff without the benefit of the majority of the diagnostic evidence in the record.  Thus, for instance, the ALJ agreed with Dr. Chan's assessment that, although plaintiff arrived at her examination in 2004 with a cane, it was "not medically necessary" in part because none of plaintiff's physicians "prescribed any type of a hand-held assistive device for use ambulating" (Tr. 23).  However, this assessment, while technically accurate, necessarily ignored Dr. Vasishtha's treatment notes indicating that he subsequently prescribed plaintiff a knee brace and back brace in 2008 and that he continued to recommend that she use these items through at least June 2011 (Tr. 675-76, 711, 721).  Plaintiff also reported to SSA in a March 2008 disability report that she used a cane, walker and "Brace/Splint" (Tr. 358).  Dr. Vasishtha

61

may have prescribed these braces to assist plaintiff in ambulating and/or carrying out her activities of daily living, particularly those that require carrying heavy objects or bending or leaning.  Indeed, this would be consistent with Dr. Vasishtha's finding that plaintiff walked with an abnormal gait at times (Tr. 669, 711).  The ALJ did not ask plaintiff about her use of the prescribed braces or her cane at the hearing.  To the extent that plaintiff's claim that she used a medically necessary assistive device or received assistance from others was unsubstantiated "by virtue of lacunae in the record, it was incumbent upon the ALJ to see to it that these gaps were filled by supplemental evidence." See Taylor v. Barnhart, 117 F. App'x 139, 141 (2d Cir. 2004) (summary order); see also Meadors v. Astrue, 370 F. App'x 179, 185 n.2 (2d Cir. 2010) (summary order) (ALJ "cannot simply selectively choose evidence in the record that supports his conclusions . . . [or] mis-characterize a claimant's testimony" (internal quotation marks and citation omitted)).

Accordingly, because the ALJ's credibility assessment was flawed, on remand, the ALJ should reconsider his assessment in light of the objective medical record and the standards set forth above.

IV.  Conclusion

For all the foregoing reasons, plaintiff's motion for judgment on the pleadings in granted (Docket Item 20) and the Commissioner's cross-motion is denied (Docket Item 23).  The case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Dated:   New York, New York
         September 23, 2016

                              SO ORDERED


                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to:

Christopher Connolly, Esq.
Assistant United States Attorney
Southern District of New York
Third Floor
86 Chambers Street
New York, New York  10007

Howard D. Sherwin, Esq.
Legal Aid Society of Rockland County
2 Congers Road
New City, NY 10956